IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 09-808 |
| KATHLEEN SEBELIUS, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM**

## I. INTRODUCTION

Plaintiff, Department of Public Welfare of the Commonwealth of Pennsylvania ("PA DPW"), initiated this civil action by filing a two-count complaint on June 23, 2009. In Count One, PA DPW seeks judicial review of a decision of the Departmental Appeals Board ("DAB") of the United States Department of Health and Human Services ("HHS") under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. In Count Two, PA DPW asserts a claim against Defendant, Kathleen Sebelius, Secretary of HHS, for violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522(a)(2). Defendant has filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the motion will be granted.

## II. **UNDISPUTED FACTS**[1]

In 1935, the Aid to Families with Dependent Children
("AFDC") grant program was established by Title IV-A of the
Social Security Act ("Title IV-A"), 42 U.S.C. §§ 601 et seq. The
AFDC program assisted States in providing aid to needy children
and the parents or relatives with whom they resided. Title IV-A
set out detailed requirements for a State plan to participate in
the AFDC program and provided for Federal reimbursement of a
percentage of the total amount expended quarterly for aid under a
State plan and a percentage of the expenses incurred by a State
to administer its plan. (Docket No. 7-1, p. 2).

The AFDC program was considered an "open-ended entitlement
program" because the amount of Federal funds payable to a State
in any fiscal year was determined by the amount of allowable
expenditures a State incurred. Stated differently, there was no
maximum amount of Federal funds which a State was entitled to
receive in a fiscal year under the AFDC program. States
participating in the AFDC program were responsible for recovering
overpayments to AFDC recipients and submitting the Federal share

---

[1]The Court's summary of the undisputed facts is derived from
the DAB's decision (Docket No. 7-1), Defendant's Concise
Statement of Material Facts Not in Dispute (Docket No. 20), and
PA DPW's Response thereto (Docket No. 23). In this regard, the
Court notes that PA DPW agrees with Defendant that there are no
material facts in dispute and that summary judgment on Count One
may be granted as a matter of law. PA DPW maintains, however,
that summary judgment should be entered in its favor rather than
Defendant's favor. (Docket No. 21, p. 11).

of the recovered overpayments to HHS's Administration of Children and Families ("ACF").[2]  (Docket No. 7-1, pp. 2-3).

In 1996, the Personal Responsibility and Work Opportunity Reconciliation Act ("the Welfare Reform Act of 1996"), (P.L. 104-193, 110 Stat. 2105 (1996)), amended Title IV-A to replace the AFDC program with a program of "Block Grants to States for Temporary Assistance for Needy Families" ("TANF").[3]  To participate in the TANF program, a State is required to submit a plan outlining how it will conduct its family assistance program. In addition, a State is required to make certain certifications. 42 U.S.C. § 602(a).  Each State that is eligible to participate in the TANF program is entitled to receive from HHS an annual State Family Assistance Grant ("SFAG") which is based on the amounts that previously had been paid by HHS to the State for the AFDC program and several related programs.  A State participating in the TANF program also may be entitled to a bonus to reward a decrease in the State's illegitimacy rate or a bonus to reward high performance; certain States may be entitled to a supplemental grant for population increases; and needy States may

_____

[2]Regulations applicable to the AFDC program defined "overpayment" as "a financial assistance payment received by or for an assistance unit [individual or family] for the payment month which exceeds the amount for which the unit was eligible." 45 C.F.R. § 233.20(a)(13)(i)(A).  (Docket No. 7-1, pp. 2-3).

[3]After the amendment, Title IV-A remained codified at 42 U.S.C. §§ 601 et seq. (Docket No. 7-1, p. 2, fn 1).

3

be entitled to contingency funds.[4]  42 U.S.C.    § 603(a)(2),(3) and (4), § 603(b).

The TANF program was established to slow the growth of Federal welfare spending and increase the flexibility of States in operating programs designed to "provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives."  42 U.S.C. § 601(a).  In exchange for increased program flexibility, States gave up their entitlement to be paid Federal funds for all cash assistance payments meeting Federal requirements.  Thus, unlike the AFDC program which it replaced, the TANF program is not an open-ended entitlement program.  A dollar limit on the amount of Federal funds each participating State is entitled to receive during a fiscal year, or a "cap," is calculated in accordance with the provisions of amended Title IV-A.  States were eligible to start participating in the TANF program on October 1, 1996.  (Docket No. 7-1, pp. 4-5).

After the replacement of the AFDC program with the TANF program, States continued to be responsible for recovering overpayments to former AFDC recipients and a question arose concerning the manner in which States should repay HHS for the

_____

[4]A letter of credit system allows a State to request and receive, or "draw down," Federal funds as needed, consistent with the grant authorizing the use of such funds.  (Docket No. 7-1, pp. 3-5).

Federal share of any continuing AFDC overpayment recoveries. The issue was initially addressed by ACF in Program Instruction ("PI") 99-2, which was transmitted to the States on March 9, 1999. With respect to recoveries of AFDC overpayments made on or before September 30, 1996, prior to the repeal of the AFDC program, PI 99-2 stated that the Federal share of the recovered AFDC overpayments must be returned to ACF with a check made payable to HHS. As to recoveries of AFDC or TANF overpayments made on or after October 1, 1996, the effective date of the TANF program, PI 99-2 stated that "[t]he full amount of these recovered overpayments is to be retained by the State and used for TANF program costs."[5] (Docket No. 7-1, p. 6, Docket No. 7-5, pp. 130-31).

On May 1, 2000, ACF transmitted to the States a revision of PI 99-2 which updated ACF policy on the treatment of recovered

_____

[5]The period during which States were required to transition from the AFDC program to the TANF program extended from October 1, 1996 to July 1, 1997. (Docket No. 7-5, p. 116). Thus, despite the repeal of the AFDC program on September 30, 1996, it was possible for States to continue making AFDC payments for a 9-month period. Recoveries of AFDC overpayments made after the effective date of the TANF program are not at issue in this case.

AFDC overpayments made on or before September 30, 1996.[6]  PI 99-2

(Revised) provided in relevant part:

\*   \*   \*

Although the AFDC Program was repealed and replaced with the
TANF Program, a number of AFDC overpayments remain
outstanding, and the requirement to pursue and recover the
remaining uncollected AFDC overpayments remains in place.

This transmittal is effective for recoveries made after
9/30/96.  Recoveries made prior to the date of this
transmittal will be evaluated on reasonable interpretation
of statutory requirements or any previous guidance provided
by ACF.

Where a State is able to recover all or a portion of an
outstanding AFDC or TANF overpayment made to the AFDC or
TANF recipient, the recovery will be either by recoupment
from the recipient's current TANF grant or by a cash
repayment from the recipient.  The full amount of these
recovered overpayments is to be retained by the State and
used for TANF Program costs.

The following procedures are required:

a.  The amounts recovered must be credited against the
    current [TANF] grant in the fiscal year in which the
    overpayment was recovered.

\*   \*   \*

(Docket No. 7-1, p. 6, Docket No. 7-5, p. 133).

Thus, unlike PI 99-2 which instructed the States to return to ACF

the Federal share of recovered AFDC overpayments made to

_____

[6]PI 99-2(Revised) also addressed the treatment of recovered
AFDC or TANF overpayments made after October 1, 1996, the
effective date of the TANF program.  Like PI 99-2, PI 99-2
(Revised) instructed the States to continue using these
overpayment recoveries for TANF program costs.  As noted in
footnote 5, these overpayment recoveries are not at issue in this
case.

recipients on or before September 30, 1996 by check payable to
HHS, PI 99-2 (Revised) instructed the States to use **all** AFDC
overpayment recoveries for TANF program costs in the fiscal year
of recovery.[7]

Four months later, on September 1, 2000, ACF transmitted PI
2000-2 to the States, which rescinded and replaced PI 99-2 and PI
99-2 (Revised). The purpose of PI 2000-2 was to clarify ACF
policy with regard to the treatment of continuing AFDC
overpayment recoveries by the States. Like PI 99-2 (Revised)
which it replaced, PI 2000-2 states that it is effective for
recoveries of AFDC overpayments made after September 30, 1996,
and that AFDC overpayment "recoveries made prior to the date of
this transmittal will be evaluated on reasonable interpretation
of statutory requirements or any previous guidance provided by
ACF." (Docket No. 7-5, p. 136).

In PI 2000-2, ACF noted that the States' treatment of AFDC
overpayments recovered between October 1, 1996 and August 21,
1998 (when the final expenditure report for the AFDC program was

---

[7]The major difference between PI 99-2 (Revised) and PI 99-2
is the latter program instruction's failure to distinguish
between AFDC overpayments made before the repeal of the AFDC
program and those made after. Instead of returning AFDC
overpayments made before the repeal of the AFDC program to ACF by
check payable to HHS as instructed in PI 99-2, States were now
instructed to retain these AFDC overpayment recoveries for use in
the TANF program.

originally due) had varied.[8]  As a result, ACF set out the
actions that States were to take "to ensure that the Federal
share of all AFDC overpayment recoveries has been or is returned
to ACF."  (Docket No. 7-1, pp. 7-8, Docket No. 7-6, pp. 137-39).
PI 2000-2 also stated in relevant part:

*    *    *

For recoveries of former AFDC program overpayments made
before October 1, 1996, States are required to repay to the
Federal government the Federal share of these recoveries.
These rules apply regardless of the fiscal year in which the
recoveries are collected and received by the States....

*    *    *

A.  For recoveries of former AFDC program overpayments where
the overpayment occurred after October 1, 1996, States are
not required to repay to the Federal government the Federal
share of such recoveries.  Instead, the full amount of these
recovered overpayments is to be retained by the State and
used for TANF program costs during the grant year in which
they are recovered, or later.

(Docket No. 7-6, pp. 138, 140).[9]

_____

[8]Specifically, ACF noted in PI 2000-2 that some States
continued to report AFDC overpayment recoveries on their
Quarterly Expenditure Reports identifying the Federal share of
the recoveries on either Line 9 or Line 10 depending on whether
the recoveries were made via recoupment from current cash
assistance payments or via cash repayment.  For those States,
negative AFDC program grant awards were issued to effect the
"repayment" of the Federal share of the overpayments recovered.
In other States, AFDC overpayment recoveries were tracked and the
Federal share remitted to ACF via check.  In still other States,
a combination of the previously described procedures was used.
Finally, some States took no action to ensure that the Federal
share of recoveries on AFDC overpayments occurring prior to
October 1, 1996 was returned to ACF.  (Docket No. 7-6, p. 138).

[9]A chart attached to PI 2000-2 also indicated that the
Federal share of recoveries of AFDC overpayments made before

8

On August 7, 2007, the Office of Inspector General ("IG") of HHS prepared a report following his audit of the States' reimbursement of the Federal share of recovered AFDC overpayments made before October 1, 1996. In his report, the IG noted that of the 43 States reviewed,[10] 24 States had complied with Federal requirements and reimbursed ACF for the Federal share of AFDC overpayments recovered after the AFDC program ended, while the remaining 19 States and the District of Columbia continued to recover overpayments from former AFDC recipients and had not reimbursed ACF for the Federal share of those overpayments. The IG recommended that (a) ACF collect the Federal share of AFDC overpayment recoveries from the 19 States and the District of Columbia which had not complied with the Federal reimbursement requirement and (b) ACF establish monitoring procedures to ensure that the Federal government receives its share of future State-recovered AFDC overpayments in a timely manner. (Docket No. 7-5, pp. 109-110, Docket No. 20, Docket No. 23).

PA DPW administered the AFDC program for the Commonwealth of Pennsylvania which was one of the States identified in the IG's

---

October 1, 1996 must be returned to ACF, while the Federal share of recoveries of AFDC overpayments made on or after October 1, 1996 was to be retained and used for TANF program costs. (Docket No. 7-6, p. 142).

[10]Four States that had already been reviewed separately were excluded from the audit, as well as three States that required additional work. (Docket No. 7-5, p. 117).

audit report that had failed to reimburse HHS for the Federal
share of AFDC overpayments made before, and recovered after, the
repeal of the AFDC program.   Specifically, the IG's audit
revealed that for the period October 1, 1996 to June 30, 2006, PA
DPW had recovered AFDC overpayments totaling $10,598,095, but had
not reimbursed HHS for the Federal share of these overpayments
which totaled $5,609,572.   (Docket No. 7-5, p. 123).

     On June 26, 2008, ACF sent a letter to PA DPW requesting the
$5,609,572 by check payable to HHS within 30 days.   (Docket No.
7-5, pp. 106-08, Docket No. 20, Docket No. 23).   PA DPW appealed
the reimbursement request or "disallowance" to HHS's DAB.
(Docket No. 7-2, pp. 41-42).   On April 16, 2009, however, the DAB
issued a decision upholding the determination that PA DPW was
obligated to repay the $5,609,572, representing the Federal share
of recovered AFDC overpayments made on or before September 30,
1996, to HHS.   (Docket No. 7-1, p. 23, Docket No. 20, Docket No.
23).

     Significantly, before the DAB and in the present case, PA
DPW (a) does not dispute that it recovered the $10,598,095 in
AFDC overpayments identified in the IG's report, (b) does not
challenge the IG's calculation of the Federal share of these
recovered AFDC overpayments, (c) does not deny that it failed to
return the Federal share of these AFDC overpayment recoveries to
HHS; and (d) admits that the Federal share of these recovered

10

AFDC overpayments was used to supplement its TANF grant.[11]
(Docket No. 7-1, p. 12).

### III. SUMMARY JUDGMENT STANDARD AND SCOPE OF REVIEW UNDER APA

Under Rule 56(c) of the Federal Rules of Civil Procedure,
summary judgment is appropriate when there is no genuine issue of
material fact and the moving party is entitled to judgment as a
matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986).  Although Count One of PA DPW's complaint involves review
of agency action under the APA, it is nevertheless appropriate
for summary judgment.  See Sierra Club v. U.S. Army Corps of
Engineers, 450 F.Supp.2d 503 (D.N.J.2006)("In general, courts
have recognized that summary judgment is appropriate to
adjudicate claims based on an agency's administrative record.");
Southern Utah Wilderness Alliance v. Norton, 326 F.Supp.2d 102
(D.D.C.2004)("This Circuit has repeatedly recognized that summary
judgment is an appropriate procedure when a court reviews an
agency's administrative record."); Lake Erie Alliance for the
Protection of the Coastal Corridor v. U.S. Army Corps of
Engineers, 526 F.Supp. 1063 (W.D.Pa.1981)("... in light of the
limited role of the court in reviewing the administrative record
already in existence, this is the type of case which is well

---

[11]In this connection, PA DPW's brief in the appeal to the
DAB states: "Pennsylvania did not return these collections to
ACF, but instead used the money to enhance services provided to
needy families under the Temporary Assistance for Needy Families
(TANF) block grant program."  (Docket No. 7-2, p. 45).

suited for summary judgment."); <u>Douglas v. Manbeck</u>, No. 91-3122, 1991 WL 237823 (E.D.Pa. Nov. 8, 1991)("Civil actions questioning the decision of the Commissioner [of Patents and Trademarks] are appropriate for summary judgment, because the decision is based on the administrative record and there can be no genuine issue of material fact regarding the contents of the record.").

Under the APA, a reviewing court must hold unlawful and set aside agency action, findings and conclusions determined to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). Judicial review of a procedural error under the APA is subject to a separate more exacting review than the deferential standard applicable to a substantive challenge to the merits of an agency's decision. <u>See</u> <u>American Bankers Ass'n v. Nat'l Credit Union Admin.</u>, 513 F.Supp.2d 190 (M.D.Pa.2007).

**IV. LEGAL ANALYSIS**

**Count One -**

PA DPW challenges the DAB's decision under the APA on both procedural and substantive grounds. Each argument made by PA DPW in opposition to Defendant's motion for summary judgment will be addressed separately.

i

Regarding its procedural challenge to the DAB's decision,[12] PA DPW relies on the following part of Section 116(b)(3) of the Welfare Reform Act of 1996, which sets forth the procedure for closing out a State's AFDC program and transitioning to the TANF program:

\* \* \*

"... The head of each Federal department shall - (A) use the single audit procedure to review and resolve any claims in connection with the close out of programs under such State plans...."

\* \* \*

The Single Audit Act, 31 U.S.C. §§ 7501-7507, to which the above-quoted part of Section 116(b)(3) of the Welfare Reform Act of 1996 refers provides in part:

### § 7502. **Audit requirements; exemptions**

**(a) (1) (A)** Each non-Federal entity that expends a total amount of Federal awards equal to or in excess of $300,000 or such other amount specified by the Director under subsection (a)(3) in any fiscal year of such non-Federal entity shall have either a single audit or a program-specific audit made for such fiscal year in accordance with the requirements of this chapter.

\* \* \*

31 U.S.C. § 7502(a)(1)(A).[13]

---

[12]Docket No. 1, p. 4, ¶ 15.a.

[13]Under the Single Audit Act, an audit is to be conducted by an "independent auditor" which is defined as "an external State or local government auditor who meets the independence standards included in generally accepted government auditing standards" or "a public accountant who meets such independence standards." 31 U.S.C. § 7501(8).

13

In its appeal to the DAB, PA DPW submitted the affidavit of Gary L. Weaver, Director of PA DPW's Bureau of Financial Reporting, Office of Budget, to support its procedural argument. Mr. Weaver's affidavit states:

\* \* \*

2. DPW's federal programs, including TANF, have been subject to a Single Audit Act audit from the inception of the TANF program in 1996.

3. In no Single Audit Act audit of DPW's programs in 1996 to date was an exception taken or finding made relative to DPW's retention of overpayment recoveries from the Aid to Families With Dependent Children (AFDC) program.

(Docket No. 7-7, p. 172).

PA DPW maintains that ACF is compelled to accept the absence of exceptions or adverse findings regarding its use of the AFDC overpayment recoveries at issue in the Single Audit Act audits referred to in Mr. Weaver's affidavit and is precluded from relying upon the audit conducted by HHS's IG to disallow PA DPW's retention of the $5,609,572. After consideration, the Court concludes that the DAB correctly rejected PA DPW's Single Audit Act argument.

As noted by the DAB,[14] the part of Section 116(b)(3) of the Welfare Reform Act of 1996 on which PA DPW relies to support its procedural challenge to disallowance of the $5,609,572 is not as

---

[14]Docket No. 7-1, pp. 19-20.

clear as PA DPW contends when read in conjunction with the

preceding language that states:

> "... Claims made with respect to State expenditures under a
> State plan approved under part A of title IV of the Social
> Security Act (as in effect on September 30, 1995) with
> respect to assistance or services provided on or before
> September 30, 1995, shall be treated as claims with respect
> to expenditures during fiscal year 1995. Each State shall
> complete the filing of all claims under the State plan (as
> so in effect) within 2 years after the date of the enactment
> of this Act...."

Moreover, as the DAB further noted, on August 29, 1997, ACF

transmitted PI 97-4 to provide additional instructions to the

States for closing out AFDC accounts in accordance with Section

116 of the Welfare Reform Act of 1996 and explained the meaning

of the foregoing language as follows:

*   *   *

> States should note that all expenditures that a State claims
> pursuant to these instructions are subject to the following
> conditions:

*   *   *

> 4. Claims for expenditures must meet the two year limit
> for filing claims for expenditures, in accordance with
> Section 1132 of the Social Security Act and 45 CFR part
> 95, Subpart A...."

(Docket No. 7-8, p. 221).

In turn, Section 1132 of the Social Security Act, 42 U.S.C.

§ 1320b-2, and 45 C.F.R. § 95.4 provide in pertinent part:

**§ 1320b-2. Period within which certain claims must be filed**

(a) Claims

Notwithstanding any other provision of this chapter ..., any claim **by a State** for payment with respect to an expenditure made during any calendar quarter by the State-

> (1) in carrying out a State plan approved under subchapter ... IV ... of this chapter,...

\*   \*   \*

shall be filed (in such form and manner as the Secretary shall by regulations prescribe) within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter; ... (Emphasis added).

\*   \*   \*

**Title 45. Public Welfare**
**Part 95. General Administration - Grant Programs**

**§ 95.4 Definitions**

In this subpart-

\*   \*   \*

Claim means **a request for Federal financial participation** in the manner and format required by our program regulations, and instructions and directives issued thereunder. (Emphasis added).

\*   \*   \*

Simply put, the Court can find no support for PA DPW's assertion that the term "claims" in the part of Section 116(b)(3) of the Welfare Reform Act of 1996 on which it relies to support its Single Audit Act argument encompasses a claim by ACF in 2008 (well after the expiration of the two-year period for filing claims in accordance with that section of the Welfare Reform Act

16

of 1996) for reimbursement of Federal funds already disbursed to PA DPW under the now-repealed AFDC program and improperly paid by PA DPW to former AFDC recipients.

Further, as also noted by the DAB, the Single Audit Act specifically provides for additional audits by Federal agencies in 31 U.S.C. § 7503(b) and (c),[15] which state:

### § 7503. **Relation to other audit requirements**

**(a)** An audit conducted in accordance with this chapter shall be in lieu of any financial audit of Federal awards which a non-Federal entity is required to undergo under any other Federal law or regulation.  To the extent that such audit provides a Federal agency with the information it requires to carry out its responsibilities under Federal law or regulation, a Federal agency shall rely upon and use that information.

**(b) Notwithstanding subsection (a), a Federal agency may conduct or arrange for additional audits which are necessary to carry out its responsibilities under Federal law or regulation.**  The provisions of this chapter do not authorize any non-Federal entity (or subrecipient thereof) to constrain, in any manner, such agency from carrying out or arranging for such additional audits, except that the Federal agency shall plan such audits to not be duplicative of other audits of Federal awards. (Emphasis added).

\* \* \*

PA DPW, however, fails to address these provisions of the statute.

In sum, the Single Audit Act precludes HHS from requiring PA DPW to perform more than one audit of its Title IV-A program in any fiscal year.  The statute does not preclude an additional

---

[15]Docket No. 7-1, p. 20.

audit by HHS's IG because the Federal audit was necessary for HHS
to carry out its responsibility to monitor welfare spending under
the AFDC program.  See 42 U.S.C. § 605(c)(2).  As Defendant
notes, PA DPW's interpretation of the Single Audit Act would
permit a State to retain Federal funds received under a grant
program to which it admittedly was not entitled simply because
the independent auditors who performed the Single Audit Act
audits happened to overlook the State's subsequent recovery of
overpayments made in administering the program.  Nothing in the
Single Audit Act requires such a result.[16]  (Docket No. 19, p.
15).

### ii

Next, PA DPW raises a substantive challenge to the DAB's
decision, asserting that the DAB's conclusion with respect to the
AFDC overpayments recovered **before September 1, 2000** is
arbitrary, capricious and contrary to law.  (Docket No. 1, p. 4,
¶ 15.b).  Specifically, PA DPW argued before the DAB that it was
not unreasonable to interpret amended Title IV-A as allowing
retention of all AFDC overpayments recovered before September 1,
2000 for use in the TANF program for the following reasons: (a)
"Federal appropriation law did not absolutely prohibit such

---

[16]As further noted by Defendant, PA DPW's Single Audit Act
argument would result in "the absurd notion that Congress
intended to leave the fox guarding the chicken coup."  (Docket
No. 19, p. 13).

18

retention"; (b) "[PI] 99-02 [Revised] construed PRWORA to authorize such retention"; and (c) "Section 403(a)(1) [of Title IV-A] does not establish the dollar limit or cap that would be exceeded by allowing the State to retain the collections." (Docket No. 7-1, p. 14, Docket No. 7-2, p. 8).

**Federal Appropriations Law**

Section 1301(a) of Title 31 of the United States Code provides that Federal "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." PA DPW does not dispute that its use of the recovered AFDC overpayments made on or before September 30, 1996 to supplement Pennsylvania's TANF grant violated general Federal appropriations law. PA DPW contends, however, that it should be allowed to retain the recovered AFDC overpayments at issue because the Government Accountability Office ("GAO") has recognized an exception to 31 U.S.C. § 1301(a) "where other statutes authorize an agency to credit collections to a current appropriation." (Docket No. 7-1, p. 14, Docket No. 7-2, p. 51). In support of the foregoing argument, PA DPW submitted GAO Opinion 179708 O/M (Dec. 1, 1975) ("the GAO decision") to the DAB. (Docket No. 7-1, pp. 14-15, Docket No. 7-6, pp. 156-68). After reviewing the GAO decision, the Court agrees with the DAB that the decision provides no support for PA DPW's exception to Federal appropriations law argument.

As noted by the DAB, the subject of the GAO decision was the now-repealed 31 U.S.C. § 686(b), which addressed the issue of how a **Federal** agency should account for reimbursements that arise from inter- or intra-agency transactions involving the furnishing of materials, work, or services on a reimbursable basis (as permitted by the now-repealed 31 U.S.C. § 686(a)). Section 686(b) set forth the basic rule that such reimbursements must be credited to the account which earned them, irrespective of when the reimbursements were collected. However, the GAO decision noted that many inter- or intra-agency transactions, particularly in the case of the Department of Defense, were subject to specific statutory provisions which either supplemented or wholly superseded Section 686(b). The GAO decision did not address exceptions to the general Federal appropriations law set forth in 31 U.S.C. § 1301(a), and PA DPW has failed to cite any statutory provision which supplements or supercedes 31 U.S.C. 1301(a) to permit its use of funds appropriated for the AFDC program in the TANF program.[17] As a result, the DAB's rejection of PA DPW's

---

[17]In this regard, the DAB noted that it had recognized in prior decisions that Congress might by statute override the general Federal appropriations law set forth in 31 U.S. § 1301(a) by authorizing the use of AFDC funds for TANF purposes. The DAB further noted that while Congress had specifically provided for use of TANF funds for AFDC purposes, nothing in the statute authorized the use of AFDC funds for TANF purposes. See Texas Dept. of Human Services, DAB 1954 (2004). (Docket No. 7-1, p. 15).

20

exception to Federal appropriations law argument was not arbitrary, capricious or contrary to law.

**Reasonable Reliance on PI 99-2 (Revised)**

As noted previously, ACF's PI 99-2 (Revised) instructed States to (a) retain **all** AFDC overpayment recoveries (whether made before or after the repeal of the AFDC program), (b) use those recovered AFDC overpayments for TANF program costs and (c) credit the recovered AFDC overpayments against the TANF grant in the fiscal year in which the AFDC overpayments were recovered. (Docket No. 7-5, pp. 133-34). PA DPW asserts that it reasonably interpreted PI 99-2 (Revised) to permit retention of the AFDC overpayments at issue which were recovered before September 1, 2000 (when the transmittal was rescinded by PI 2000-2) for use in its TANF program. Again, the Court concludes that the DAB's rejection of this argument was not arbitrary, capricious or contrary to law.

As the DAB noted in its decision, although PI 99-2 (Revised) stated that **all** recovered AFDC overpayments were to be retained by the States and used for TANF program costs, the instruction also stated that recovered AFDC overpayments must be credited against the TANF grant in the fiscal year in which the overpayments were recovered. PI 99-2 (Revised) did not authorize a State's use of recovered AFDC overpayments made on or before

21

September 30, 1996 to increase the State's TANF grant in a fiscal year. (Docket No. 7-1, p. 16).

As further noted by the DAB, PI 99-2 (Revised) can be reconciled with the applicable statutory and regulatory provisions "if read to mean that a state may substitute the recovered amounts for cash it otherwise would draw down to cover current TANF expenditures, so long as the state also credits the cash amounts against its current TANF grant authority." (Docket No. 7-1, p. 16). PA DPW admits that it did not credit the AFDC overpayment recovered before September 1, 2000 against its TANF grants in the fiscal years of the recoveries. Instead, PA DPW supplemented its TANF grants with funds that had been appropriated for the AFDC program before its repeal in violation of Federal appropriations law and exceeded the dollar limit or cap on its TANF grants.[18]

**Dollar Limit or Cap on TANF Grants**

PA DPW also argued before the DAB that it was entitled to retain the AFDC overpayments recovered before September 1, 2000 because Section 603(a)(1) of Title IV, relating to SFAGs, does not establish the dollar limit or cap on Federal TANF funds that

---

[18]In this connection, the DAB also pointed out that PA DPW failed to submit any evidence that it, in fact, relied on an interpretation of the statute or ACF transmittals in determining the manner in which the Federal share of AFDC overpayments recovered after the repeal of the AFDC program would be used. (Docket No. 7-1, pp. 16-17).

22

would be exceeded by allowing PA DPW to retain these AFDC overpayment recoveries. After consideration, the Court concludes that the DAB's rejection of this argument was not arbitrary, capricious or contrary to law.

PA DPW is correct that the SFAG may not represent the total amount of Federal TANF funds to which a State is entitled in a fiscal year. As noted previously, in addition to a SFAG, a State participating in the TANF program may be eligible for a bonus, a supplemental grant and contingency funds.[19] However, the Court agrees with the DAB that this possibility is meaningless. It does not matter whether the Federal TANF grant awarded to a State for a fiscal year consists solely of a SFAG or whether a State's Federal TANF grant is increased due to the State's eligibility for a bonus, a supplemental grant or contingency funds. Any bonus, supplemental grant or contingency funds awarded to a State in a fiscal year would be subject to a statutory formula under Title IV. Therefore, a dollar limit or cap would still exist on the State's annual Federal TANF grant which may not be exceeded by using AFDC overpayment recoveries to supplement those funds. The dollar limit or cap for the fiscal year simply would be higher than it would be if the State was not eligible for a bonus, a supplemental grant or contingency funds.

---

[19] See 42 U.S.C. §§ 603(a)(2), (3) and (4), 603(b).

23

In any event, as the DAB further noted, PA DPW does not allege that it was awarded a bonus, a supplemental grant or contingency funds under Section 603 of Title IV-A during the period at issue, "much less that it used the federal share of AFDC overpayment recoveries to substitute for federal cash it otherwise could have drawn down, consistent with the total amount of federal TANF funds it had been granted."[20]  (Docket No. 7-1, pp. 15-16).

### iii

PA DPW's next substantive challenge to the DAB's decision relates to the AFDC overpayments at issue which were recovered **after September 1, 2000**.  (Docket No. 1, p. 4, ¶ 15.c).  Although PA DPW concedes that its retention of these AFDC overpayments was impermissible under PI 2000-2 which was issued on September 1, 2000, PA DPW argues that ACF's transmittal of policy instructions regarding treatment of recovered AFDC overpayments made before October 1, 1996 (when the TANF program became effective) was illegal under Section 617 of amended Title IV-A which provides:

---

[20]The DAB also noted that the affidavit of Randy Sprout, PA DPW's Division Chief in the Office of the Budget, Comptroller Operations, acknowledged that Pennsylvania "receives a specified amount of federal TANF funding each year" and that, by posting the overpayment collections as "minus expenditures against the grant," Pennsylvania is able to draw down additional federal TANF funding.  While Mr. Sprout conceded that "in theory" this recording method could allow Pennsylvania to exceed the dollar limit or cap on its TANF grant, Pennsylvania submitted no evidence to show that this did not, in fact, occur.  (Docket No. 7-1, p. 16).

## § **617. Limitation on Federal authority**

> No officer or employee of the Federal Government may
> regulate the conduct of States under this part or enforce
> any provision of this part, except to the extent expressly
> provided in this part.

42 U.S.C. § 617.[21]

After consideration, the Court agrees with the DAB that the
program instructions of the ACF at issue in this case are outside
the scope of 42 U.S.C. § 617. Section 617 reasonably may be
interpreted as limiting HHS's regulation of State TANF programs
after the amendment of Title IV-A by the Welfare Reform Act of
1996.[22] The issue raised in this case is the manner in which
States must account for recoveries of the Federal share of AFDC
overpayments made under Title IV-A prior to the statute's
amendment in 1996. (Docket No. 7-1, p. 18). Accordingly, there

---

[21] It should be noted that PA DPW did not explain to the DAB,
and it has not explained to this Court, how it can rely on PI 99-
2 (Revised) to justify its retention of the AFDC overpayments at
issue that were recovered before September 1, 2000, while also
asserting that the program instructions transmitted by ACF
regarding the treatment of AFDC overpayment recoveries after
implementation of the TANF program, including PI 99-2 (Revised),
are illegal.

[22] With regard to the limitation on HHS's regulation of State
TANF programs in Section 617 of amended Title IV-A, as noted
previously, HHS gave up its right to extensively regulate the
States' family assistance programs in exchange for States giving
up their entitlement to be paid Federal funds for all cash
assistance payments meeting Federal requirements.

is no basis for finding the DAB's rejection of this argument to be arbitrary, capricious or contrary to law.[23]

**iv**

PA DPW's last substantive challenge to the DAB's decision, which was raised in its appeal to the DAB,[24] pertains to the weight to be accorded decisions by the DAB in three prior appeals raising the issue of the manner in which States are required to account for recoveries of AFDC overpayments made on or before September 30, 1996, when the AFDC program was repealed.[25]   PA DPW argued that three earlier DAB decisions were entitled to "absolutely no weight" in its appeal because, among other things,

---

[23]Before the DAB, PA DPW contended that "[s]o long as the TANF statute can be reasonably construed to allow the State to retain AFDC collections for TANF purposes, the State is entitled to follow its own construction of the statute and disregard the ACF interpretation." As noted by the DAB, the main problem with this argument is PA DPW's failure to cite any statutory language that reasonably could be interpreted as permitting a State to exceed the dollar limit or cap on its Federal TANF grant for a fiscal year by supplementing the grant with AFDC overpayment recoveries.   (Docket No. 7-1, p. 18, Docket No. 7-2, p. 53).

[24]Docket No. 1, p. 4, ¶ 15.d.

[25]See Wisconsin Dept. of Workforce Development, DAB 2137 (2007)(HELD: Wisconsin could not account for the Federal share of AFDC overpayment recoveries by spending the recovered funds for TANF benefits because such accounting would have permitted Wisconsin to exceed the cap on its Federal TANF funds), Texas Dept. of Human Services, DAB 1954 (2004)(HELD: use of AFDC overpayment recoveries to augment the State's TANF grant was not permissible under Federal appropriations law), and Iowa Dept. of Human Services, DAB 1874 (2003)(HELD: Iowa's use of AFDC overpayment recoveries for cash assistance payments under its TANF program violated Federal appropriations law).   (Docket No. 7-1, pp. 8-11).

26

the DAB does not maintain an index of its decisions in accordance with the requirements of FOIA. (Docket No. 7-2, p. 49).

In response to PA DPW's "FOIA index" argument, the DAB initially determined that it meets FOIA's indexing requirements because DAB decisions are not only listed on its website, the decisions are searchable by key word and title.[26] For reasons which will be discussed *infra* in connection with Defendant's motion for summary judgment on Count Two of PA DPW's complaint, the Court concludes that PA DPW lacks standing in this case to challenge the sufficiency of the DAB's decision index. In any event, FOIA specifically provides that a final opinion may be relied on, used, or cited as precedent by an agency against a party ... if "the party has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(2)(E)(ii). As noted by the DAB, the purpose of a FOIA index is to "provid[e] identifying information," and PA DPW's citation of the three earlier DAB decisions in its appeal brief shows that it was able to identify the DAB decisions which had addressed the issue of States' treatment of recoveries of AFDC overpayments made on or before September 30, 1996. (Docket No. 7-1, pp. 8-9). In light of the

---

[26]In its appeal to the DAB, PA DPW submitted a copy of a "Decisions Search" conducted on the DAB's website. In the exhibit, the DAB's decisions are listed by date in reverse chronological order and include the names of the appellants. (Docket No. 7-7, pp. 174-214).

foregoing, the DAB's discussion of three prior decisions raising the very issue presented in PA DPW's appeal was not improper.[27]

**v**

Prior to the replacement of the AFDC program with the TANF program on October 1, 1996, Section 603(b) of Title IV-A read, in relevant part, as follows:

**§ 603. Payments to States**

\* \* \*

**(b) Method of computation and payment**

\* \* \*

> **(2)** The Secretary of Health and Human Services shall then certify to the Secretary of the Treasury the amount so estimated by the Secretary of Health and Human Services, ... (B) reduced by a sum equivalent to the pro rata share to which the United States is **equitably entitled, as determined by the Secretary of Health and Human Services**, of the net amount recovered during any prior quarter by the State or any political subdivision thereof with respect to aid to families with dependent children furnished under the State plan, ... (emphasis added).

\* \* \*

In its brief in opposition to Defendant's motion for summary judgment, PA DPW argues that Defendant's failure to make an "explicit finding" that HHS is "equitably entitled" to the Federal share of the recovered AFDC overpayments at issue in

---

[27]In any event, despite the discussion of its three prior decisions, there is no evidence that the DAB failed to conduct a de novo review in PA DPW's appeal based on the particular facts presented.

accordance with the foregoing provision of the now-repealed AFDC statute precludes ACF from seeking reimbursement of such funds. (Docket No. 21, p. 17). Assuming, arguendo, that this argument has not been waived due to PA DPW's failure to raise it before the DAB (see Docket No. 24, p. 8), the Court finds the argument meritless.

Contrary to PA DPW's assertion, Section 603(b) of the now-repealed AFDC statute did not mandate an "explicit finding" of equitable entitlement by the Secretary of HHS. The statute merely required HHS to determine the amount of AFDC overpayments recovered by a State to which the United States is equitably entitled. The disallowance in this case based on the results of the IG's audit of Pennsylvania's reimbursement of the Federal share of recovered AFDC overpayments made prior to the repeal of the AFDC program may be construed as a determination that HHS is equitably entitled to be reimbursed by PA DPW in the amount of $5,609,572.

Section 116(b)(2) of the Welfare Reform Act of 1996 relating

to the transition from the AFDC program to the TANF program

states in relevant part:

**SEC. 116. EFFECTIVE DATE; TRANSITION RULE.**

\* \* \*

**(b) Transition Rules. – Effective on the date of the
enactment of this Act:**

\* \* \*

**(2) CLAIMS, ACTIONS, AND PROCEEDINGS.** - The amendments made
by this title shall not apply with respect to -

... **(B)** administrative actions and proceedings commenced
before such date, or authorized before such date to be
commenced, under such provisions.

\* \* \*

Relying on this section of the Welfare Reform Act of 1996, PA DPW

asserts in its brief in opposition to Defendant's motion for

summary judgment that HHS is prohibited from seeking

reimbursement of the recovered AFDC overpayments at issue because

the collection proceeding was not commenced or authorized to be

commenced before the effective date of the Welfare Reform Act of

1996. (Docket No. 21, p. 17). Again, assuming, arguendo, that

PA DPW did not waive this argument by failing to raise it before

the DAB (see Docket No. 24, pp. 9-10), the Court finds the

argument meritless.

30

Under Section 116(b)(2), the provisions governing the TANF
program may not be applied in collection proceedings commenced,
or authorized to be commenced, on or before September 30, 1996,
when the AFDC program was still in effect. The section has
nothing to do with HHS's right to collect the Federal share of
recoveries of AFDC overpayments made before the repeal of the
AFDC program. Rather, as noted by Defendant, ACF's reimbursement
request or disallowance in this case is governed by 45 C.F.R. §
74.72(a), which provides in pertinent part:

> ## § **74. Subsequent adjustments and continuing**
> **responsibilities.**
>
> **(a)** The closeout of an award does not affect any of the
> following:
>
> > **(1)** The right of the HHS awarding agency to disallow
> > costs and recover funds on the basis of a later audit
> > or other review.
> >
> > **(2)** The obligation of the recipient to return any funds
> > due as a result of later refunds, corrections, or other
> > transactions.
>
> \* \* \*

**Count Two -**

In Count Two of its complaint, PA DPW asserts a separate
claim under FOIA, rather than the APA, regarding the indexing
requirements of FOIA. PA DPW alleges that "[t]he DAB does not
maintain an index of its final opinions or of orders made in the

31

adjudication of cases, as required by FOIA,"[28] which provides in

relevant part:

## § 552. **Public information; agency rules, opinions, orders, records, and proceedings**

**(a)** Each agency shall make available to the public information as follows:

\* \* \*

**(2)** Each agency, in accordance with published rules, shall make available for public inspection and copying-

**(A)** final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

\* \* \*

... Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication.... A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if-

**(i)** it has been indexed, and either made available or published as provided by this paragraph; or

**(ii)** the party has actual and timely notice of the terms thereof.

---

[28]Docket No. 1, pp. 5-6, ¶ 19.

\* \* \*

Defendant asserts that PA DPW lacks standing to pursue the FOIA claim in Count Two of the complaint. After consideration, the Court agrees.

To satisfy the requirements of standing, a party invoking Federal jurisdiction bears the burden of establishing the following elements: (1) "injury in fact" which is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of which requires that the injury be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

PA DPW has made it clear that the FOIA claim asserted in Count Two of its complaint does not arise out of the disallowance of the Federal share of recovered AFDC overpayments that is the subject of Count One. Rather, Count Two is a generalized claim that the DAB fails to comply with the indexing requirements of FOIA in connection with its final decisions. (Docket No. 26, pp. 7-8). However, PA DPW has failed to cite a single instance in which the alleged inadequacy of the DAB's "index" of its final decision under FOIA has resulted in its failure to find a prior

DAB decision which would have been advantageous to PA DPW in an appeal before the DAB. As a result, this case is simply not the proper case to challenge generally the sufficiency of the DAB's "index" of its final decisions. The foregoing conclusion, however, should not be construed as a determination by the Court that the DAB does, in fact, satisfy the indexing requirements of FOIA in connection with its final decisions. A determination of this issue must be left for another day.

Two additional points should be addressed. First, PA DPW asserts that because it is seeking declaratory and injunctive relief in Count Two, the requirements of standing are relaxed as noted by the Court of Appeals for the Third Circuit in <u>The St. Thomas-St. John Hotel & Tourism Assoc., Inc. v. Govt. of the United States Virgin Islands</u>, 218 F.3d 232 (3d Cir.2000). Contrary to this assertion, the Court agrees with Defendant that the <u>St. Thomas-St. John Hotel</u> case actually supports a finding that PA DPW does not have standing in this case, rather than undermines it. Specifically, the Court of Appeals for the Third stated that "[a]lthough declaratory judgments are frequently sought in advance of the full harm expected, they must still present a justiciable controversy rather than 'abstract, hypothetical or contingent questions,'" 218 F.3d at 240, citing, <u>Alabama State Federation of Labor v. McAdory</u>, 325 U.S. 450, 461

(1945), and, at this point, PA DPW's FOIA claim fails to present a justiciable controversy.

Second, PA DPW noted that in Comm. of Pennsylvania Dept. of Public Welfare v. United States of America, United States Dept. of Health and Human Services, C.A. No. 99-175, 2001 U.S.Dist. LEXIS 3492 (W.D.Pa. Feb. 7, 2001), the Honorable D. Brooks Smith, while he served as the Chief Judge of this Court, held that PA DPW had standing to sue HHS for a violation of the indexing requirements of FOIA.[29] (Docket No. 21, pp. 21-22). As noted by Defendant, however, the facts presented to Judge Smith are readily distinguishable from the facts presented in this case. (Docket No. 24, pp. 15-16).

In Judge Smith's case, PA DPW asserted that HHS violated FOIA by, among other things, failing to properly index statements of policy adopted by the agency in connection with several cooperative Federal-State grant programs. In finding that PA DPW had established an "injury in fact" for standing purposes and describing the inadequacy of HHS's index of policy statements relating to, among others, the AFDC program, Judge Smith stated:

\* \* \*

I conclude that the Commonwealth has standing to asserts its FOIA claim. First, the Commonwealth has suffered an "injury in fact" that is both concrete and actual. The

---

[29]Judge Smith was nominated to the United States Court of Appeals for the Third Circuit in September 2001. His nomination was confirmed on July 3, 2002.

35

Supreme Court has made perfectly clear that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to statute." Federal Election Commission v. Akins, 524 U.S. 11,,, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). This rule applies to the Freedom of Information Act. Public Citizen v. United States, 491 U.S. 440, 449, 105 L.Ed.2d 377, 109 S.Ct. 2558 (1989). The facts of record showing that HHS has failed to meet the indexing and publication requirements of FOIA satisfy the "injury in fact" threshold. The Commonwealth has been deprived of information - precisely the kind of deprivation that FOIA was meant to bar. Without current or complete indices - as mandated by statute - the Commonwealth is unable to determine precisely what rules and regulations govern its conduct and is without sufficient information to structure its AFDC, EA, and TANF programs in the future. Little more is needed to establish a constitutional injury in fact.

\* \* \*

A few general rules, then, can be gleaned from the statutory language and legislative history. First, a FOIA index must include those matters that the agency considers to be of precedential value. Second, while there is no absolute bar to including obsolete materials in the index, there must be some way to distinguish these materials from those that have precedential significance. Without such a distinction, the index would be "cluttered" and its "usefulness" limited. Id. Finally, there is no set formula that an agency must follow in designing its index. Whether the index is organized alphabetically, chronologically, or by subject matter is left completely to the discretion of the agency itself.

\* \* \*

While the AFDC/EA index includes "precedent setting" documents, it is neither "manageable" nor a "useful tool." Id. The problem with the index is not that it includes obsolete documents. Inclusion of such documents is simply not barred under FOIA. Instead, the problem is that it is nearly impossible from the index alone to determine exactly which documents are precedent setting and which are obsolete. For instance, the index policies that "are applicable to programs which are no longer administered by the Office of Family Assistance," id. at 152a, P 3, but there is no way of distinguishing these policies from the

36

index alone. In addition, "some documents listed in the index that were issued after 1986 may be obsolete but the Office of Family Assistance cannot identify them from the index alone." Id. P. 4. When it enacted FOIA's indexing requirement, Congress made clear that it wanted these indices "in a usable and concise form." H.Rep. No. 876, reprinted in FOIA Source Book, at 125; see also 1967 Attorney General's Memorandum, at 21. No doubt, an agency need not "convert an index ... into such a form that it can be sued by the average layman without staff assistance." 1975 Attorney General's Memorandum, at 18. Nevertheless, in the present case, the undisputed facts show that even the defendants themselves cannot parse out the obsolete documents from reviewing the index alone. If the index is not useful to the defendants' own staff members, I can hardly see how the Commonwealth, or any member of the public, could find it so.

\* \* \*

2001 U.S.Dist.LEXIS 3492, at \*\*63-64, 78-79, 80-82.

Unlike the facts presented to Judge Smith, PA DPW has failed to show in this case that it has been deprived of information as a result of HHS's alleged violation of FOIA's indexing requirements with regard to final DAB decisions. Accordingly, Judge Smith's standing determination has no relevance here.

**V. CONCLUSION**

For the foregoing reasons, judgment as a matter of law will be entered in favor of Defendant and against PA DPW.

William L. Standish
United States District Judge

Date: October **14**, 2010

37